UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JAMES ADISON HOLMES, JR, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-09-273 |
| | § | |
| JOHN DOE SCOUTS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

On October 22, 2010, United States Magistrate Judge Brian L. Owsley signed a Memorandum and Recommendation recommending that Defendant Deputy Bruce Parson's motion for summary judgment be denied and that the case proceed to trial. (D.E. 69.) On November 5, 2010, Parson filed Written Objections to the Magistrate Judge's Memorandum and Recommendation. (D.E. 74.) The Court has reviewed the findings of fact and conclusions of law in the Memorandum and Recommendation, as well as the pleadings on file and Defendant's Objections, and has made a *de novo* disposition of those portions of the Magistrate Judge's recommendation to which objections were raised. See Koetting v. Thompson, 995 F.2d 37 (5th Cir. 1993); 28 U.S.C. §636(b)(1)(C); Fed. R. Civ. P. 72(b). For the reasons stated below, the Court hereby ADOPTS, as its own, the findings and conclusions of the Magistrate Judge, *except* for the proposed findings of fact indicated herein regarding the identity of the "security guard" and the "TDCJ guard" referred to in Plaintiff's and Deputy Parson's statements.

**I.    Background**

Plaintiff James Adison Holmes, Jr. is an inmate in the Texas Department of Criminal Justice, Correctional Institutions Division ("TDCJ-CID") and is currently confined in the Smith Unit in Lamesa, Texas. On October 8, 2009, Plaintiff filed this action pursuant to 42 U.S.C. §

1983, alleging that while he was in the custody of Live Oak County, Officer Michael Skau, a hospital security guard, assaulted him, and that Live Oak County Deputy Bruce Parson and TDCJ-CID Officer Pedro Amador failed to protect him from Officer Skau. (D.E. 1.)[1] Plaintiff claimed that Officer Skau's use of excessive force against him and Deputy Parson's and Officer Amador's failure to protect him violated his Eighth Amendment rights under the United States Constitution and his rights under the Texas Constitution. (Id. at 15-19.)[2]

On August 20, 2010, Defendant Deputy Parson filed a motion for summary judgment on the grounds that there was no evidence he knew of a serious risk to plaintiff which he ignored in deliberate indifference, and that, in any case, he acted reasonably under the circumstances, entitling him to qualified immunity. (D.E. 57.)

On October 22, 2010, the Magistrate Judge signed a Memorandum and Recommendation recommending that the Court deny Deputy Parson's motion for summary judgment, finding that issues of fact remain as to whether Parson knew Plaintiff was at risk of harm from Officer Skau, (D.E. 69, p. 12), and as to whether Parson's actions were objectively reasonable in light of said risks to Plaintiff's safety. (D.E. 69, p. 14-15.)

On November 5, 2010, Defendant Parson filed Written Objections to the Memorandum and Recommendation. (D.E. 74.)

---

[1] Plaintiff initially referred in his complaint to Officer Skau as "John Doe Scouts" and Officer Amador as "John Doe Correctional Officer."

[2] On July 6, 2010, the Court adopted the recommendation of the Magistrate Judge to dismiss Plaintiff's claims against Officer Skau because, although he was a TDCJ correctional officer, Skau was acting as an employee of the hospital, rather than the state, at the time of the assault. In addition, the Court adopted the Magistrate Judge's recommendation not to join Christus Spohn Beeville Hospital as a defendant in the proceeding because the hospital is not a state actor subject to liability under § 1983. (D.E. 44.)

## II.     Discussion

### A.     The Magistrate Judge Correctly Relied on the Record as a Whole

The summary judgment evidence includes a video containing footage of the incident from three different cameras in the hospital.  (D.E. 41.)  In his Objections, Deputy Parson argues that the Magistrate Judge's "lack of reference to the video tape suggests that the video tape was not considered in the summary judgment determination."   (D.E. 74 at 4.)   However, the Memorandum and Recommendation indicates that the Magistrate Judge reviewed the whole record on file, pursuant to the usual standard of review on summary judgment.  (D.E. 69, p. 5-6) (citing Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002)).  The record included, among other things, Plaintiff's and Deputy Parson's statements to the Beeville police (D.E. 40); the statements of hospital employees who witnessed portions of the incident (D.E. 40); the video, which was filed with the Court on June 30, 2010 (D.E. 41); and Plaintiff's "Proof of Evidence." (D.E. 60.)  After reviewing the record as whole, the Magistrate Judge nonetheless recommended that issues of fact remained as to Deputy Parson's knowledge of the risk to Plaintiff's safety and as to the reasonableness of Parson's response.  (D.E. 69, p. 12, 15.)

As discussed below, the Memorandum and Recommendation makes certain erroneous proposed findings, which conceivably could have been avoided by paying closer attention to the video evidence.  However, the Magistrate Judge could not have relied solely – or even primarily – upon the video evidence in making the summary judgment determination.  As is apparent from watching the video, the hospital cameras did not record crucial portions of the incident.  The video contains imperfect views of the portions of the incident that were recorded.  And the video does not contain audio.  (D.E. 41.)  Accordingly, the Magistrate Judge's decision to focus on other evidence – primarily, the statements of witnesses to the incident – was appropriate.

### B.    Erroneous Proposed Findings of Fact

Defendant contends the Magistrate Judge made the following erroneous proposed findings of fact, and that these findings led the Magistrate Judge to incorrectly deny Deputy Parson's motion for summary judgment: first, that Officer Skau had his hand over his gun as if he were ready to draw it (D.E. 74, p. 7); second, that Plaintiff observed Officer Skau with his gun unsnapped and his hand on the gun when the nurse finished wrapping Plaintiff's hand (Id. at 8); third, that Plaintiff asked Officer Skau "what was he going to do, draw on me?" (Id.); fourth, that Deputy Parson stated to the police that, prior to the altercation between Officer Skau and Plaintiff, Parson observed Skau standing in the hall with his hand on his pistol as if ready to draw it (Id. at 8-9); fifth, that Deputy Parson stated that just prior to the altercation, Plaintiff had requested Officer Skau's name and badge number  (Id. at 11-12); sixth, that there are inconsistencies between Deputy Parson's statement to the Beeville police and his Affidavit regarding whether "tensions were rising prior to plaintiff being wheeled out of the hospital" and whether "the physical altercation began as soon as plaintiff asked for Officer Skau's badge number."  (Id. at 11) (quoting D.E. 69, p. 11.)

Defendant is correct that the Memorandum and Recommendation incorrectly identifies Officer Skau as the TDCJ guard that Plaintiff and Deputy Parson saw with his hand on his gun as if ready to draw it.  Plaintiff's statement to the police, especially when read in conjunction with the video evidence, shows that the "armed TDCJ guard" or "TDCJ guard" standing in the hall with his hand on his gun is distinct from the "hospital security guard" or "security guard" who took Plaintiff through the hall in a wheel chair and allegedly assaulted him (i.e. Officer Skau). (D.E. 40, p. 16; D.E. 41.)[3]  It was TDCJ Officer Amador, not Officer Skau, who unsnapped his

---

[3] For example, Plaintiff states: "I saw an armed TDCJ guard walk up to the door.  The security guard told him to watch me.  The TDCJ guard unsnapped the safety strap on his revolver and put his hand on the butt." (D.E. 40 at

gun and put his hand on his gun while the nurse wrapped Plaintiff's hand. (D.E. 40, p. 16.) When Plaintiff stated to the police that he asked Parson "what was he going to do, draw on me?" Plaintiff was apparently referring to Officer Amador, not to Officer Skau. (Id.)

Likewise, Deputy Parson's statement to the police shows that Officer Skau is the "hospital security guard" referred to in Parson's statement, and is distinct from the "TDCJ guard" standing in the hall with a gun (i.e. Officer Amador). (D.E. 40 at 15; D.E. 41.)[4] Thus, when Deputy Parson stated to the police that Plaintiff asked him who the "TDCJ guard was and why he was standing with his hand on the butt of his gun," Parson was referring to Officer Amador, not Officer Skau. (D.E. 40 at 15.) Parson's statement also indicates that Plaintiff requested that Parson get him the name of the TDCJ guard holding a gun (Officer Amador), not the name of Officer Skau. (Id.) Thus, the Memorandum and Recommendation incorrectly concludes that Plaintiff asked Deputy Parson to "get Officer Skau's name and badge number" just before Officer Skau grabbed Plaintiff in a chokehold. (D.E. 69, p. 10.)

Given this revised reading of Parson's statement, Defendant is correct that there is not necessarily any inconsistency between Parson's statement to the Beeville police and Parson's August 19, 2010 Affidavit, in which Parson states that the altercation broke out "[s]uddenly and without warning[.]" (D.E. 57, Ex. 1 (Parson Affidavit) at ¶ 8.) As explained, Parson did not state to the police that he had previously observed Officer Skau standing in the hall with his hand on his pistol as if ready to draw it and that Plaintiff asked him for Officer Skau's name and badge number just before Skau put Plaintiff in a choke hold. (D.E. 69, p. 10.)

---

16.) The video shows the TDCJ guard standing in the hall outside the hospital room with his hand on his gun. (D.E. 41.)

[4] The distinction between the "security guard" (Skau) and the "TDCJ guard" (Amador) is made clear from the following passage from Parson's statement: "The [hospital security] guard then started pushing Holmes down the hall to the exit and I followed behind. As we were walking down the hall I turned around and looked at the TDCJ guard and saw that he still had his hand on the butt of his pistol. I then heard Holmes ask me to get the name of the TDCJ guard and when I turned back around I saw that the security guard grabbed the back of Holmes shirt and was choking him and told him to shut up and then grabbed him in a choke hold." (D.E. 40 at 15.)

However, this does not necessarily indicate that tensions were *not* rising prior to the physical altercation between Officer Skau and that Deputy Parson was not aware of a risk of danger to Plaintiff from Officer Skau. Moreover, Parson apparently admits, without specifying, that there are certain inconsistencies between his statement to the police and his Affidavit. (D.E. 74, p. 6.) Defendant argues these inconsistencies are a "non-issue" because "[o]nce Deputy Parson reviewed the surveillance video he realized that his recollection of the events which he gave in his statement was not completely accurate." (Id.) However, a fact finder should be permitted to view all the evidence, including the video as well as the parties' statements regarding the incident, and determine which rendition of events to believe. As the Magistrate Judge noted, any inconsistencies between Parsons' statement to the police and his Affidavit may be relevant to a trier of fact's determination of whether Deputy Parson's actions in response to Officer Skau's conduct were unreasonable. (D.E. 69, p. 15.)

### C. *De Novo* Review of the Evidence Supports the Magistrate Judge's Conclusion That Issues of Fact Remain for Trial

Despite some confusion regarding the identity of the armed TDCJ guard, upon *de novo* review of all the evidence, including the video, the Court agrees with the Magistrate Judge's conclusion that issues of fact remain for trial. The video supports Defendant's revised interpretation of the parties' rendition of events described above. (D.E. 41.) However, the video does not, as Defendant contends, resolve the issues of fact identified by the Magistrate Judge in the Memorandum and Recommendation: namely, whether Parson knew of and was deliberately indifferent to a serious risk to Plaintiff's safety (D.E. 69, p. 12) and whether Parson's actions were objectively reasonable under the circumstances. (Id. at 15).[5] For the reasons explained

---

[5] Defendant contends the Magistrate Judge did not address the second prong of the "deliberate indifference" analysis – namely, whether Parson was actually aware of a substantial risk of serious harm to Plaintiff. (D.E. 74 at 5) (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994).) However, the Magistrate Judge did address this prong, concluding

below, the Court chooses to adopt the Magistrate Judge's proposed findings and conclusions in this regard.

Plaintiff contends that Deputy Parson was "fully aware" of the risk to Plaintiff's safety from Officer Skau's "assaulting behaviors" and that Parson "did nothing to intervene and just watch[ed] as Security Officer Skau repeatedly choked Plaintiff." (D.E. 60, p. 1.) Plaintiff contends that Parson "left Plaintiff in harm's way by leaving to go obtain his Police car while Plaintiff Holmes was still being choked and pined to the wall." (Id. at 3.) Plaintiff further contends that Parson was "fully aware" of "the dragging of Plaintiff [to the Police car] while in a headlock and in full restraints helpless and defensively unable to protect himself and the slamming of the Police car door on [Plaintiff's] legs[.]" (Id. at 2.)

Deputy Parson contends the summary judgment evidence, including his own statements as well as the video evidence, shows he did not know of a risk to Plaintiff's safety and that, in any case, his actions were objectively reasonable. (D.E. 74.) In his Affidavit, Parson states that, as they approached the hospital exit, a "minor altercation broke out between Skau and Holmes." (D.E. 57, Ex. 1 (Parson Affidavit) at ¶ 8.) "As a result of the altercation, Skau restrained Holmes by placing Holmes in a headlock." (Id.) Parson states that he attempted to "verbally calm" Skau and Holmes, but was unsuccessful. (Id.) He states that it appeared to him that "Skau's level of force was appropriate," that he "saw no injury occur to Holmes at this time," and that he "did not believe that Holmes was at risk of any serious injury." (Id. at ¶ 10.)

The video evidence does not add to the record with respect to this portion of the altercation. Skau's actions and Parson's response cannot be seen on the video because the

---

that "[a] fact issue exists as to whether or not Deputy Parson knew plaintiff was at risk of harm when he left him alone with Officer Skau to go retrieve the patrol car." (D.E. 69, p. 12.) In any case, as explained below, upon *de novo* review of the evidence the Court finds issues of fact exist as to whether Deputy Parson actually made the inference that there was a risk of serious harm to Plaintiff at any point during the incident.

camera is obstructed by a column. (D.E. 41.) In any case, the video does not contain audio. Accordingly, the video evidence does not allow the Court to determine, as a matter of law, that Parson was not aware of a risk of harm to Plaintiff or that Parson's actions were objectively reasonable. In making the summary judgment assessment, the Court may not weigh the evidence or evaluate the credibility of witnesses. See Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir.1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). It remains for a trier of fact to review the evidence in order to determine precisely what occurred as the parties approached the hospital exit and to evaluate the credibility of Parson's assertions regarding his knowledge of the risk to Holmes and the reasonableness of his actions (or inaction) in response to Skau's use of force against Holmes.

The parties' statements, as well as the video evidence, show that Officer Skau next moved Holmes outside. In his Affidavit, Deputy Parson states that, "[i]n an attempt to prevent the situation from escalating further, [he] decided to pull [his] squad car around to the ER entry as quickly as possible and get Holmes inside the car." (D.E. 57, Ex. 1 (Parson affidavit) at ¶ 11.) He states that when he returned with his squad car he saw that Skau had Holmes placed against the wall, but "did not see Holmes' face make contact with the wall." (Id.) He "did not see any injuries to Holmes" and "did not see anything that led [him] to conclude that Holmes was at [sic] a substantial risk of serious harm." (Id.)

It is not clear from the video whether it would have been visible to a bystander that Holmes' face made contact with the wall. However, the video tape does show that, after he retrieved his patrol car, Deputy Parson stood and watched for approximately one minute while Officer Skau continued to hold Plaintiff in a headlock and led him, still in a headlock, to the squad car. (D.E. 41.) The video shows that, as Parson walked around to the front of the squad

car, Skau proceeded to place Holmes in the back seat and shut the door on Holmes' legs two times. (Id.)[6] In his Affidavit, Parson states that when he walked to the front of the car, he "had no reason to anticipate that Skau was going to shut the [car] door on Holmes' ankle" and was "not aware of any substantial risk of serious harm at the time Skau placed Holmes in the back of [his] squad car." (D.E. 57, Ex. 1 (Parson affidavit) at ¶ 12.) Again, the video evidence does not resolve the issue. It remains for a trier of fact to evaluate the credibility of Parson's assertions that he saw no injury or risk of injury to Holmes that would have merited his intervention at any point during the incident. Morris, 144 F.3d at 380.

### III. Conclusion

Accordingly, the Court DECLINES TO ADOPT the Magistrate's Memorandum and Recommendation with respect to the proposed findings of fact noted above regarding the identify of the security guard and the TDCJ guard. However, the Court ADOPTS the Magistrate Judge's conclusion that issues of fact remain for trial as to Deputy Parson's knowledge of a risk to Plaintiff's safety and the reasonableness of Parson's actions given said risk.

SIGNED and ORDERED this 4th day of January, 2011.

_____
Janis Graham Jack
United States District Judge

---

[6] Parson's statement to the police also confirms this, stating that Skau "threw Holmes into the back seat but before Holmes could get his legs inside the security guard [Skau] slammed the door on his legs and slammed the door on his legs again." (D.E. 40, p. 15.)